## Case No. 5,752.

GREEN et al. v. The ADELAIDE.

[Taney, 575.] [1]

Circuit Court, D. Maryland. Nov. Term, 1857.

COLLISION—BETWEEN SAILING VESSELS—SIGNAL-LIGHTS.

1. A vessel at anchor in a public channel, on a dark and stormy night, without having the proper signal-lights set, can have no claim for

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

damages sustained from a collision with another vessel.

[Cited in J. W. Everman, Case No. 7,591.]

2. But where such lights are set, and are not seen by the vessel under weigh, until within fifty yards of the other vessel, and unskilfulness is displayed in the measures then used by the vessel under weigh, to avoid a collision, she will be held responsible for the consequences thereof.

[Appeal from the district court of the United States for the district of Maryland.]

This was a proceeding in rem, instituted by the owners of the brig Laurel and the owners of her cargo, against the schooner Adelaide, to recover damages sustained by a collision between the two vessels, on the 8th of December, 1856. The libellants charged, that on the 8th day of December, 1856, about five o'clock a. m., the said brig being at anchor near Willoughby's Point lightship (below Hampton Roads), under the charge of the pilot, and all hands being on deck with the pilot, preparing to weigh anchor, with a signal lantern hoisted at the forestay; a vessel was perceived coming down upon the brig. As soon as the last-mentioned vessel was perceived thus bearing down, the crew of the brig, or some of them, commenced hailing, to warn the strange vessel, and continued hailing until just before the collision occurred. Captain Hays, the master of the brig, likewise kept waving a hand-lantern on deck for the same purpose, until the collision occurred. The collision took place, and by it the brig had her mainmast carried away, and her covering-board, plank shears, water-ways, and bulwarks broken, and suffered other damage, which she was compelled to put into Norfolk to repair; whereby the cargo also suffered damage by the delays and expenses incident thereto. The colliding vessel proved to be the schooner Adelaide, of Plymouth, Massachusetts; and if she had kept a proper watch she must have seen the brig lying at anchor, and have heard the hailing from her in time to have prevented the collision.

The defence taken in the answer was, that the schooner had encountered during the night, a severe storm, and lost her flying-jib, which rendered her unmanageable, and was making for Hampton Roads for an anchorage. About five o'clock in the morning, before day, when about two miles east from Willoughby's Point light-boat, the wind still blowing very fresh, and in squalls, from the N. N. W., all hands and officers being on deck, the mate tending the jib-sheets, and keeping a look-out, a vessel was discovered ahead, which proved to be the brig Laurel. The atmosphere was thick and hazy, particularly towards the land, in which direction the brig was, and objects could not be seen far off; the brig had no lights discernible to any one on board the schooner, and the master, and all hands on board the respondent's vessel, thought that the brig was under weigh, and on a different tack from the schooner, and that they would at every moment be

receding further and further from each other. The brig, however, was not more than fifty yards off when first seen, and in order to avoid, as far as might be, all possibility of collision, the mate, who was the first person to see the said brig, the moment he saw her, cried out, "Heave the helm up," which order was instantaneously obeyed; the schooner began to fall off directly, but the wind was very flawy, and a flaw struck her as she was going off, and prevented her doing so. Soon after the brig was descried, a light was perceived moving about on board of her, which confirmed the impression of those on board the schooner that the brig was in motion; a cry was heard from the brig which those on board the schooner could not understand, and in a moment after another cry, "Keep off;" but inasmuch as everything had been done which was possible on the part of those on board the schooner, from the moment the brig was first seen, to avoid a collision, the warning was of no avail. That the said schooner having lost her flying-jib, and being a flat-bottomed boat, it was impossible to make her tack, except after long and repeated trials, and the last time it had been attempted before the collision, she had failed four times; and the order so given and obeyed, as aforesaid, was the best way of avoiding collision, and would have prevented one, if it had been in the power of those in charge of the said schooner, by any possible means, to do so; but in spite of the most skilful management on the part of those in charge of said schooner, in consequence of the direction and violence of the wind, and the sudden flaw striking her as she was beginning to fall off, she was driven against the said brig. That everything that prudence could suggest was done to avoid collisions and danger of every sort, by those on board the schooner, and inasmuch as a diligent look-out was kept by them during the night, they must have seen any lights properly set on board the brig, but as they did not see them, there could not have been any such. The libel was dismissed by the district court (Giles, J.) [case unreported], and an appeal was taken to this court. A great deal of conflicting testimony was taken, the substance of which is stated in the opinion of the court.

Brown & Brune, for appellants.
Wallis & Thomas, for appellees.

TANEY, Circuit Justice. This is a case of collision; in cases of this description, it almost always happens that there is a conflict in the testimony; and the case before the court is not altogether free from that difficulty. It is admitted, that the brig Laurel was at anchor in the Chesapeake Bay, about two miles below the lighthouse on Willoughby's Point, the lighthouse bearing west from the brig; it appears, that it is usual for vessels to anchor at that place, and also for smaller vessels, like the schooner, to sail

over it. The collision took place about five o'clock, or a few minutes before, in the morning of December 9th, 1856, when the day had not yet dawned; the wind was heavy from N. N. W., and squally, with frequent flaws; the night was starlight with a few scuds; the brig headed about N. N. E., being swung round a little by the flood-tide, it being, as the pilot on board the Laurel says, near the last of the flood.

The first question in dispute is, whether the brig had a signal-light hung out at the proper place; and upon this point there is some contrariety in the testimony. If she had not such a light, the fault was undoubtedly on her part, and she would have no claim for the damage she sustained by the collision. But I think the proof on behalf of the Laurel, is conclusive on this question. The testimony of every witness who was on board the Laurel, concurs in establishing this fact; and it is impossible to doubt it, without imputing to them a concerted plan of misrepresentation; they all speak positively as to the particular period of time at which they noticed the light, and the pilot says he saw it there immediately after the collision. I see no sufficient ground for doubting their truth, or the accuracy of their several statements.

There is some apparent conflict between this evidence and that offered by the respondents, but none, I think, that can impair its weight. These witnesses say they saw no light before the collision, except the lamp brought up by the captain of the Laurel when he heard the alarm. All of this may be very true, they may not have observed the signal-light forward, in the moment of excitement and alarm at the impending collision; their attention was fixed upon the position of the ship which they were so nearly and rapidly approaching, and not upon the manner in which she was lighted. The pilot of the Laurel himself says, that when he came on deck, at the first alarm, he did not observe whether the signal-lamp was burning or not, because his attention was fixed upon the approaching schooner; but went forward immediately after the collision, and saw that it was burning and in its proper place. The mate of the schooner, indeed, says, that after the collision was over, and the schooner had anchored, he saw the light and also one aft, put up; the amount of this is nothing more than that he then saw them up; not, I presume, that he saw them in the act of going up; and if he is even understood to mean that he saw when they were actually going up, his testimony would hardly be sufficient to outweigh the concurring testimony of so many witnesses to the contrary; for, it must be remembered, that this witness was the look-out at the head of the schooner, and had strong temptations to acquit himself of the charge of neglect of duty, in not observing a signal-light, until he was within fifty yards of the vessel.

I think, therefore, that no negligence or

fault can be imputed to the brig; and the question remains to be examined, whether there was negligence or fault on the part of the schooner. In this part of the case there is no material conflict of testimony; and I take the facts as stated by the witnesses for the respondents.

It appears, that the Adelaide had been all that night beating into the capes, and up the bay, against a heavy head wind; she had lost her flying-jib, and was less manageable on that account, and was endeavoring to reach an anchorage in Hampton Roads; she had made her way so far up as to be nearly abreast of the light-boat on Willoughby's Point. The wind, as the captain of the schooner states, was about N. N. W., when the Laurel was first seen, and before the helm was put up, the schooner was heading W. N. W., being closehauled to the wind and with all her sails set; she was standing across the bay from the eastern side, and the Laurel, it appears, was lying at anchor about two miles below, east of the light-boat, and directly in the track of the Adelaide. It was a starlight night, in which a vessel under sail could have been seen at the distance of more than a mile, although she carried no light; the Adelaide was seen by those on board the Laurel at that distance; yet it appears, and is proved by the testimony of the respondents, that no one on board the schooner saw the Laurel, until they had come within fifty yards of her. I do not see how this can be accounted for, except by the want of a proper look-out. It is true, that the mate was stationed, it is said, as a look-out ahead; but it is not sufficient that a person should be stationed as a look-out, and be called a look-out; he must perform that duty, and perform it diligently; and it is impossible to believe that a vessel like the brig, with a signal-light up, could not have been seen by a diligent look-out on board the Adelaide, long before she approached within fifty yards. The mate says he is an experienced and competent look-out; this may be so; and it may have happened, and probably did happen, that heading a little to the windward of the Laurel, she was hid from their sight by the sails of their own vessel, as they stood upon or walked on the deck; and being unaccustomed, as he says, to the navigation of the Chesapeake, he may have supposed that no vessels anchored in that wide water, and kept his look-out rather for vessels which, with that wind, might be expected to come down the bay. But this is no excuse for the omission; it was his duty to keep a vigilant look-out to the leeward as well as to the windward and ahead, and if he had done so, he could not have failed to see the light at a much greater distance. As this negligence produced the collision, the fault was on the part of the schooner, and she is responsible for the consequences. His want of acquaintance with the usages of navigation in the Chesapeake, and the usual places of anchor-

age, would be no excuse for his omission; he was bound to know, or to have some one on board who knew, the usages and customs of vessels accustomed to navigate these waters, and the places at which they occasionally anchored.

Some testimony has been offered for the purpose of showing, that the light may have been obscured, and the mate of the schooner prevented from seeing it, by a haze on the water, and by an obscurity and darkness produced by contiguous land. As to the haze on the water, the mate himself says he saw the light after the Adelaide had anchored, after the collision; and the pilot on board the Laurel says, that the Adelaide anchored at the distance of about three hundred yards. And surely if the haze on the water did not prevent him from seeing the lights, after the collision, at the distance of three hundred yards, he ought to have seen them before the collision, at an equal distance, and might and would have seen them, if he had looked out for them in the proper direction. And as to shadows or obscurity supposed to be occasioned by the vicinity of the land; there was no land to the west, to which point she was standing at the time, nor indeed, anywhere else nearer than five miles, and all of it low, with no elevated points; it is impossible that it could have exercised any influence in obscuring the light. I take the distance of the land, as well as of the anchorage of the schooner after the collision, from the testimony of the pilot; he is undoubtedly the most competent judge, and he can have no personal feeling, as his conduct is not impeached on either side.

But even if those on board the Adelaide could acquit themselves of the charge of negligence in relation to the look-out, their conduct, after they discovered the Laurel, would render their vessel responsible for the damage; for, it is obvious, upon their own testimony, that the collision could even then have been avoided by proper seamanship and ordinary precaution. When they saw the Laurel, it seems, they supposed her to be under weigh on the opposite tack, and from the manner in which she was heading, supposed they would pass each other safely, by putting the helm of the schooner hard up, so as to make her fall off from the wind, and say, they would have cleared her, if the Adelaide had not been struck by a flaw of wind which checked her in falling off. Now, they knew from the experience of the night, that the wind was squally; they knew that she had her mainsail, foresail and jib, all set and drawn nearly flat, as they were sailing close upon the wind; they knew also, that the pressure of the wind upon the mainsail had a constant tendency to prevent her falling off, and to make her luff, when a flaw of wind struck her, and with all this knowledge, they relied altogether upon the rudder to make her fall off, and

took no measures to assist or hasten it, by removing the counteracting influence of the mainsail. If that sail had been lowered, or the main sheets let go, the wind would have pressed altogether on the head sails, the schooner would have fallen off much more readily, and the flaw of wind which struck her would have aided her motion in that direction instead of retarding it. This precaution was rendered still more necessary and obvious, because she had lost her most important head sail, her flying-jib; and did not, therefore, so readily obey the rudder when the helm was put hard up. And when the vessels were so near, and the danger of collision so imminent, it was the duty of the schooner to have brought the sails to the aid of the rudder, and to have removed the strong counteracting influence of the mainsail drawn, as it was, nearly flat.

The neglect of these means can only be accounted for, by the mistake they made in supposing the Laurel to be under weigh and heading to the windward of the Adelaide upon the opposite tack; they seem, therefore, to have been under the impression, that a very slight falling off by the schooner would clear them of each other. It is difficult to imagine how practised seamen, like the master and mate, could have committed this mistake, when they were within fifty yards of the vessel, with her sails all furled, and on a starlight night; such a mistake can hardly be an excuse for running into her, when it might have been avoided by proper exertions, although she was at anchor. The mate says he was considerably excited, when he first saw the Laurel so near and directly before him; this was natural enough; but it ought not to have deprived him of his calmness and self-possession, nor prevented him from observing the true position of the vessel, and doing everything that seamanship could accomplish to prevent running into her. And if there had been no previous negligence in the lookout, the omission after she was seen, to use the means in their power to avoid the collision, would, of itself, make the Adelaide responsible. Upon each of these grounds, therefore, I think the decree of the district court is erroneous, and the libellants entitled to recover the full amount of the damages sustained by the Laurel.